Davi v. Spitzberg and Schoenfeuer, case numbers 241778 and 2607. Mr. Rossman, if at any point you can't hear us, just signal. Good morning, and may it please the court. Grace Dow for appellant. I'd like to reserve two minutes for rebuttal. In the prior appeal, this court vacated the injunction reinstating Davi as an ALJ in the denial of qualified immunity to the individual defendants because both turned on the same error of law. On remand, the district court reached the same result by largely repeating its prior analysis and giving an adequate weight to the pickering factors that this court directed it to consider. Therefore, this court can and should again vacate the injunction in the denial of qualified immunity. Under a proper application of the pickering and qualified immunity. But just on that, you're asking for it to vacate so that there can be a trial? Or what exactly are you asking for in terms of relief? Sure, we are asking for the injunction to be vacated and for the court to remand and direct the district court to enter summary judgment for both the individuals and for the agency. If I may first turn to the injunction and the issue of pickering balancing, the agency was justified in removing Davi as an ALJ under the pickering framework. Courts, including this court in cases like Locurto and Pappas, have routinely upheld even the termination of a public-facing employee where the employee's speech calls into question the employer's ability to administer public services fairly. Here, OTDA's assessment about the potential disruptive effect of Mr. Davi's Facebook comments was reasonable because the manner of his speech about a benefit that he specifically adjudicated called into question his impartiality as an ALJ. Specifically, his use of words like underclass, laziness, and failure to describe benefits applicants gives rise to, at the very least, a suspicion that he may harbor negative preconceived notions about those appearing before him that affect his decision-making. And this is particularly problematic because in reviewing the denial of benefits, he failed... It's a question of retaliatory intent. That's a question of fact, right? That's correct. I mean, it's a little mushy. Some of this is a question of law. Some of it's a question of fact. The district court concluded that a reasonable jury could find that at least Spitzberg acted with retaliatory intent and cites some things in the record. How do you respond to that? Is there indeed evidence from which a jury could find retaliatory intent? There is no cognizable evidence of retaliatory intent in the record, and the district court's... In this context, what does that mean, retaliatory intent? In other words, he acted because of the words. He was acting because of what was said. What makes it unlawful retaliation? What makes it intent to protect the public, et cetera? I'm struggling with that. Maybe you can help me with that. Of course. So retaliatory intent in this context means that the agency disciplined Mr. Davi in retaliation for his expressed views and not because of its concern for disruption that might arise from his speech. And I think that this court's decision in Licurdo kind of draws that distinction or teases it out. It says that where an employee is public-facing like Mr. Davi, the court in its Pickering analysis is permitted to consider the public's perception of the employee's speech in determining whether the employer's assessment of disruption is reasonable. And here, there is no cognizable evidence of retaliatory intent in the record, and the district court's... The argument is there really wasn't – I think the district court was saying there really wasn't a basis for believing there was a likelihood of disruption. He had a really good record, 95 percent. He was granting benefits. They talked to someone at Legal Aid. Legal Aid hadn't heard any scuttlebutt, and the district court felt that that undercut or actually helped prove that there was an intent to punish for him expressing his views. This court previously held on the prior appeal that absence of disruption – it's erroneous to consider purely the absence of actual disruption as affirmative evidence of retaliatory intent. And that's exactly what the district court again did here. If you look to pages 26 and 27 of the special appendix, and that is where the... I'm sorry. You mean as opposed to potential? Excuse me? You mean as opposed to potential interference? He said actual, actual. Yes. And I think if you look to pages 26 and 27 of the special appendix, where the district court... I'm right. I was there already. The district court pointed to two pieces of evidence that he considered evinced retaliatory intent. One was the absence of – or the defendant's failure to discover any decisions by Davi that required immediate remediation due to actual bias. And the second was silence from legal aid. And these were the only two pieces of evidence that the court looked at. But these were the exact pieces of evidence that the court considered in its prior decision, and they are proxies for actual disruption. The district court also noted that they charged Davi with actual bias when there was nothing to suggest actual bias. And that that was evidence of an intent to retaliate. Sure. So I have two responses to that. First, on pages 26 and 27, he doesn't suggest that he's relying on the idea of trumped-up charges. But even if he were, that would be clearly erroneous. Because if you look to the notice of discipline itself, which appears in the record at pages 97 to 101, it's clear that the charges against Davi were premised on his statements expressing actual bias. And there's nothing suggesting that the individuals did not believe that his statements expressed actual bias. In fact, if you look to all of the contemporaneous e-mails between the senior officials, if you look to all of their testimony, it's very consistent that they were concerned for Davi's appearance of impartiality and the agency's reputation precisely because they believed his statements expressed actual bias. If I may, Your Honor, I'd like to turn to the key undisputed pieces of evidence in the record that suggest that the agency's assessment of potential disruption here was reasonable. We've already touched on the manner of Davi's speech and the nexus, the direct nexus to his role as an ALJ. In addition to that, we also have both the testimony and contemporaneous e-mails among high-ranking agency officials offering their assessment that the speech has high capacity to disrupt the agency's reputation and its operation. And in this Court's previous decision in Piscitano, that sort of testimony was sufficient to support the reasonableness of the agency's assessment. Third, we have confirmation from the complainant that she had forwarded her complaint to legal aid, which substantiates the agency's fear of further publicization. And finally, and perhaps most importantly, we have the express findings of a neutral third-party arbitrator that Davi's comments rendered his continued employment as an ALJ, quote-unquote, untenable. And it truly would have been untenable for the agency to restore him as a hearing officer after receiving such a decision from a neutral third-party arbitrator. If there are no further questions, I'd... So you think Judge Corman got it wrong. I mean, there are two members of the bar battle. Got it wrong largely because he, both as a matter of the Pickering analysis and more broadly, refused to acknowledge the agency's view of the potential for disruption based on bias. Is that right? Yes. He again discounted the agency's assessment, and neither of the bases that he offered for doing so has merit. And I'm happy... And what were those two bases? Sure. So first, he concluded that he was entitled to second-guess the agency because the agency had purportedly failed to conduct a reasonable investigation, but the record clearly shows the opposite. Before suspending Dahvie, the agency had conducted a preliminary authentication of the Facebook post, and it also offered Mr. Dahvie a chance to explain his side of the story in an interrogation that fully comported with the rules of the collective... So what was the dispute? What was the factual dispute that Judge Corman identified? So you say clearly showed, but what was the argument on this? What was the evidence on the other side that showed otherwise? So Judge Corman stated that he believed the investigation was deficient because of certain procedures, for example, a four-day, only a four-day notice period before the interrogation, and he suggested that, I assume as a legal matter, that under Waters and Piscitano, that these sorts of procedures were unreasonable, categorically unreasonable. And our response is that Waters and Piscitano were very different cases because there the content of the speech and the authorship of the speech was disputed. And we do not have that here. The content of the speech is memorialized, and Mr. Dahvie has at no point contested that he made the Facebook comments. So the investigation here did not need to look exactly like those cases. And, in fact, Waters itself, the plurality opinion, stated that a whole wide range of investigations can be considered reasonable. The second basis, if I may, for the district court's disagreement with the agency is that it relied, it solicited and relied on the testimony, the present-day testimony of a legal aid employee. And our position is that this testimony is irrelevant under Waters because the Pickering inquiry turns on facts as the agency reasonably found at the time of the discipline and not in hindsight. And here, whether legal aid actually, in fact, received the complaint and whether they would have, in fact, filed recusal requests or succeeded on such recusal requests is a bit of a red herring because the agency's concern was for the loss of public trust and for its reputation. And those can manifest in many different ways other than the filing of recusal requests against Mr. Dahvie specifically. Thank you very much. Thank you. All right. Mr. Rosman. May it please the Court. This case involves a private Facebook conversation. It was on a discussion of proper social welfare policy. And this Court previously described my client's exercise or his use of speech in that context to be an exercise of, quote, his quintessential First Amendment rights. Mr. Spitzberg reviewed the comments. He concluded that they did not reflect any actual bias. This is on page 672 of the appendix. And subsequently, the agency did a quick review of some of his hearings and concluded that he was a fair ---- On the face of the comments, don't they give an appearance of bias? Would a claimant not be concerned about coming in front of a hearing officer who made the comments that Mr. Dahvie did? Your Honor. This country has turned welfare into a generational career path. It's not the government's job to subsidize laziness and failure. Right. Your Honor, the concept of appearance of bias can't be read so broadly that you can't express opinions about social issues. And if we can look ---- Well, then it gets us to the ---- This is an important First Amendment right to be able to express one's view. But then we get to the balancing part of tickering. Right. The employee's private interest in speaking out versus the employer's interest in furthering the goals of the agency, that kind of thing. And so the first part is important. Mr. Dahvie had an important First Amendment right. But here it's a question of law, right, the balancing, and why shouldn't the agency's interest in having integrity of the proceedings, et cetera, outweigh the individual desire to rant on a Facebook post? Well, Your Honor, there's a burden here. It's the burden of the defendants, and what they must show is that they must make a substantial showing of likely interference. And here we have really no evidence whatsoever that there would ever be interference. If this got out there perhaps by filing a lawsuit and now it's a matter of public record, would a claimant not have some concern if the claimant Googled Mr. Dahvie's name and saw that, wow, this is a hearing officer who's made these kinds of comments in the past? Well, let's look at what the defendants actually did here. After his suspension, defendants made my client a general counsel's designee. So whereas before he was making recommendations to commissioners' designees about the outcome of particular hearings, now he reviews those very decisions by commissioners' designees. That is to say they sort of put him on top of the commissioners' designees. Now, if defendants were truly concerned about people being upset about Mr. Dahvie's comments, why would they do such a thing? What evidence is there that they didn't act in good faith? I mean, what evidence is there that they were not genuinely concerned about the appearance here? Well, what I just said is at least part of it. Why is that what you just said? Because I didn't hear that concrete evidence that they were acting maliciously. They were acting. They didn't have concern about likelihood of disruption. Well, they, I mean, Mr. Dahvie's opinions as a general counsel's designee can be viewed by any appellant. So if they were really concerned about that, why would they put him up? When did they, when did they, when you say they put him up above, I guess, the supervisory capacity or requires a supervisory capacity, when did that happen vis-à-vis the message, the speech that's initiated? About seven months later. I mean, it was in June or July of 2016. So another thing is, you know, five and a half years after the speech. And then he's not in a public-facing position anymore. Well, I mean, you characterize that as not a public-facing position, but any appellant can look and see that he made the decision. And in fact. Well, just on the timeline, help me, Mr. Ross, but I need some help. He, so the message goes out, and we can describe it one way or the other. But then, as you point out, a few, some number of months thereafter, he is moved to a non-public-facing position. Is that correct? I wouldn't characterize that as a non-public-facing position. Okay. To another position. Okay. Okay, so he moved out of the position that he had when he made the engagement speech. Is that fair? Yes. Okay. When did the investigation start? The investigation started in November of 2015. If you want to call it an investigation, I mean. If you call it whatever you want. And was that after he was moved? No. That was before he was moved, right? The investigation was in November of 2000. So he was moved, so they investigate, and then they decide, let's move him out of this position to another position. Well, first, Your Honor, they tried to terminate him. No, I understand that, yeah. And then after, yes, afterwards, in June of 2016, they moved, they changed his senior, excuse me, they changed his civil service title without any particular reason. And then they also made him a general counsel's designee, where he now reviews the opinions that he used to make recommendations for. Okay. And making quibble about how you call that, but he's no longer on a day-to-day basis dealing with the public in his capacity as an employee. The only thing you can say, Your Honor, is he's not in the same room at the same time. Okay. But why that should matter is a mystery. Well, because you're making this, you're implying or suggesting that he was, he, as a result of this, he actually got a promotion. It's not a promotion. I wasn't suggesting it was a promotion. I was suggesting that by moving him into this capacity, it is at least a fact which undermines defendant's suggestion that they were really acting on behalf of some concern about likely disruption. So maybe that gets to my next question, and also Ms. Zell's argument, which is that under Pickering, the district court judge, and I have great respect for Judge Cronenberg, we owe some deference to the agency's, the defendant agency's, own assessment of the possible disruption. Can you show me somewhere in the decision of the district court where he expressed some level of deference, or any level of deference? Your Honor, I think the deference is if they make a substantial showing of likely interference. And the court below concluded that they had not made that showing. And there were many reasons to support that. For example, there was just no reaction whatsoever to this speech. And eight weeks went by between the time that they learned of the speech and the time that they tried to terminate him, and not one peep from anybody about this speech emerged. Where in the, just point out to me where in the opinion Judge Corman talked about the government's interest. Well, it certainly, I mean, Judge Corman concluded that the nature of Mr. Daube's employees weighed in OTDA's favor, weighed in the agency's favor. That's on page 23. He concluded that the prediction of likely disruption was not entitled to deference because they did not, first, they did not conduct a reasonable investigation. And second, you know, there was just a time period that went by in which there was no evidence to, again, their burden of making a substantial showing of likely interference. And you asked me for particular pages. I will give you particular pages. So the investigation is discussed on pages 14 through 17, and then the discussion about the prediction is on pages 18, 19, and 20. And what Judge Corman relied upon is that there was just no evidence that anybody, first of all, that legal aid had even received the letter, and no evidence that anybody. Wasn't there evidence that the person said, I sent it to legal aid? It is, but that person. Isn't that some evidence that legal aid got? It's circumstantial evidence. But, Your Honor, keep in mind that that person had already lied about her role in the whole thing. And this was, at the very least, somewhat lacking in credibility. And second, they made no effort to confirm it with legal aid. So it's just, you know, it was almost, Your Honor, willful blindness to whether or not this would cause likely disruption. They just assumed, based upon their reaction to the speech, that there would be likely disruption. But there was no evidence that would constitute the standard that this Court has repeatedly said is the standard, which is, again, a substantial showing of likely interference. And even if they had made that, the next burden is to show that their concern about likely interference outweighs my client's interest in expressing the speech. And their third burden is to show that they were actually concerned about the likely interference and not the content of the speech. And if I can just briefly discuss, you asked a question a while about evidence of that third point. And I just wanted to, you know, they breached a collective bargaining agreement in November of 2015, ignored the provisions. They sent out hearing notices after they concluded, after they received the Facebook exit. They sent out hearing notices with his ALJ number. And then five and a half years later, they came before this Court and asked for an administrative stay because they said doing exactly the same thing would somehow cause a massive disruption to their public reputation. They transferred his civil service title, even though they had absolutely no reason to do it. Mr. Dobby is a hearing officer today. He just doesn't hold hearings. So there was no reason. There was no reason for them to transfer his civil service title. And mostly, maybe most importantly, what Judge Corman relied on is they made allegations of actual bias despite the fact that they just didn't believe them. Let me ask you something that Giselle raised earlier, having, I think, in part to do with Waters and Judge Corman's determination that the investigation itself was not sufficient, either in terms of the intensity or the length and so on. And the argument that we heard and that you heard was that in this case, it's materially different and distinguishable from that case and other similar cases that you might rely on, insofar as there was no question about the statement being made. So what's your response to that? So that would explain, totally justify, a somewhat shorter, more attenuated investigation. And, therefore, Judge Corman, insofar as he relied on the length and nature of the investigation, got that wrong. I have two responses with that respect. First of all, Howell v. Santoro did not involve the question of what the speech was. Howell v. Santoro involved a PERB complaint alleging an unfair labor practice. Nobody disputed what the speech was. The Court, nonetheless, said when you receive a report of a speech that has the potential for disruption, you must make a reasonable investigation. And, secondly, in Waters, prior to the discussion of the specific facts, Justice O'Connor's plurality opinion specifically said one of the things that we need to find facts about might be what the listeners' reactions would be. So if that's one of the things that the investigation is supposed to uncover, one would think whether the listeners, the so-called listeners, heard the speech at all, or in this case, read the speech at all, is certainly a factor that must be investigated by the employer in order for it to constitute a reasonable investigation. Thank you very much. Thank you, Your Honors. Ms. Zell? Thank you. I'd like to make three very quick points, if I can get through them. First, I'd like to make clear that our position is not that Mr. Daube, as a former ALJ, cannot express any policy views whatsoever, but rather the manner of his speech talking about a benefit that he specifically adjudicated called into question his impartiality. And I want to make that very clear because I think that is the core of this case. Second of all, talking about a substantial showing of disruption, I'd like to point the Court to two cases that I think are helpful for showing why we've amply met that standard here. The first is this Court's decision in Piscitano. There, there was no evidence of actual disruption, yet this Court found that the agency had met its burden of showing substantial likelihood of disruption by pointing to the expert judgment of its high-ranking officials, that if certain corrections officers were affiliated with a motorcycle gang, that this may call into question their judgment and may call into question whether they can treat rival gang members in prison fairly. And I think we have that exact same evidence here. We have testimony and contemporaneous emails from high-ranking officials, such as the general counsel and the principal hearing officer. I'd also point the Court to the First Circuit's recent decision in Poussey. There, there was only one complaint from the public and no further disruption during the pendency of the disciplinary process. But the First Circuit found that this was immaterial because the police department's decisive action in addressing a loss of public trust may have tempered any sort of public outcry. So I think that analysis is very informative here because the agency did the same thing. As soon as it received the complaint letter, it immediately took Mr. Dahvie off the hearing calendar, which may have mitigated any sort of public, further public outcry. And if I may just briefly on the evidence of pretext that my friend has brought up, with respect to the investigation, the agency conducted a reasonable investigation under the Waters standard. I heard my friend refer to the Hale case, but that case did not prescribe any sort of scope of investigation that was different from what was done here. And the positions that Mr. Dahvie occupied after he was disciplined do not undercut the reasonableness of the agency's assessment because he was no longer permitted to adjudicate benefits or appear publicly before benefits applicants. Thank you very much. Thank you.